## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NABORS DRILLING TECHNOLOGIES USA INC, | § § § | |
| Plaintiff, | § § | |
| | § | Civil Action No. 3:20-cv-03126-M |
| v. | § | **REDACTED PUBLIC VERSION** |
| | § | |
| HELMERICH & PAYNE INTERNATIONAL DRILLING CO, et al., | § § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Strike, filed by Defendants Helmerich & Payne International Drilling Co.; Helmerich & Payne Technologies, LLC; and Motive Drilling Technologies, Inc. ECF No. 209. For the reasons below, the Motion is **GRANTED.** As discussed in more detail below, by **May 10, 2023,** after consulting with Nabors's counsel, H&P shall provide the Court with more specificity as to the particular words or, if appropriate, whole paragraphs of Dr. Rodgers's report that should be stricken consistent with the Court's decisions in this Opinion, and stating the specific objections of Nabors's counsel.

Although this Opinion may not contain any confidential information, the Court will, out of an abundance of caution, conditionally enter it under seal because the underlying motions and related documents, discussed below, were filed under seal. By **May 7, 2023**, the parties are **ORDERED** to file a joint status report that states whether any party believes this Opinion contains any confidential information that should remain sealed and, if so, attaches for the Court's consideration a proposed redacted public version of the Opinion.

## I.    BACKGROUND

This is a patent infringement lawsuit between two providers of drilling services in the oil and gas industry.  Plaintiff and Counter-Defendant Nabors Drilling Technologies USA, Inc. ("Nabors") and Defendants and Counter-Claimants Helmerich & Payne International Drilling Co., Helmerich & Payne Technologies LLC, and Motive Drilling Technologies, Inc. (collectively, "H&P") each assert patents generally relating to systems and methods for computerized drilling control and rotary steerable systems.

Nabors filed suit on October 14, 2020, and served its preliminary infringement contentions on November 25, 2020.  ECF Nos. 1, 34.  On April 28, 2021, following review of H&P's source code, Nabors served amendments to its contentions.[1]  ECF No. 75.

On March 8, 2023, Nabors served Dr. Rodgers's expert report regarding infringement. H&P now moves to strike portions of Dr. Rodgers's report, arguing that Dr. Rodgers's report substitutes new theories, not disclosed in Nabors's preliminary or final infringement contentions, for each of the five remaining patents asserted by Nabors,[2] and for two of the patents, accuses new products.

## II.    LEGAL STANDARD

The Federal Circuit has observed that local patent rules regarding contentions "seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories," and achieve this by "requiring both the plaintiff and the defendant in patent cases to provide early notice of their infringement and invalidity contentions, and to proceed with

---

[1] The Court will refer to the November 25, 2020, contentions as Nabors's preliminary infringement contentions, and the April 28, 2021, contentions as Nabors's final infringement contentions.  *See* Local Patent Rule 3-6 ("Each party's preliminary infringement contentions . . . will be deemed to be that party's final contentions . . . .").

[2] Nabors asserts U.S. Patent No. 7,802,634 ("the '634 Patent"), U.S. Patent No. 7,823,655 ("the '655 Patent"), U.S. Patent No. 8,360,171 ("the '171 Patent"), U.S. Patent No. 8,528,663 ("the '663 Patent"), and U.S. Patent No. 10,672,154 ("the '154 Patent").

diligence in amending those contentions when new information comes to light in the course of discovery." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365–66 (Fed. Cir. 2006). Contentions are thus "designed specifically to 'require parties to crystallize their theories of the case early in the litigation' so as to 'prevent the "shifting sands" approach to claim construction.'" *Id.* at 1364 (quoting *Atmel Corp. v. Info. Storage Devices, Inc.*, No. C 95–1987 FMS, 1998 WL 775115, at *2 (N.D. Cal. 1998)). To that end, if parties are not required to promptly amend their contentions after discovering new information, "the contentions requirement would be virtually meaningless as a mechanism for shaping the conduct of discovery and trial preparation." *Id.* at 1366.

The Local Patent Rules for this Court require that the infringement contentions must contain "[s]eparately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality . . . of each opposing party of which the party is aware. This identification must be as specific as possible. Each process, method, or act must be identified by name, if known, or by any product, device, or apparatus that, when used, allegedly results in the practice of the claimed process, method, or act." Local Patent Rule 3-1. The contentions must include "[a] chart identifying specifically and in detail where each element of each asserted claim is found within each accused instrumentality, including for each element that such party contends is governed by 35 U.S.C. § 112(f), the identify of each structure, act, or material in the accused instrumentality that performs the claimed function." *Id*.

This Court has previously discussed the relationship between infringement contentions and expert reports:

> The scope of infringement contentions and expert reports is not coextensive. *See Fenner Investments, Ltd. v. Hewlett–Packard Co*., 2010 WL 786606, at *2 (E.D. Tex. Feb. 26, 2010). Infringement contentions need not disclose specific evidence; expert reports, on the other hand, must include a complete statement of the expert's

opinions, the basis and reasons for those opinions, and any data or other information considered when forming the opinions. *Id.* However, expert reports may not introduce new theories of infringement not previously set forth in a party's infringement contentions. *Id.* **The critical question in deciding whether to strike portions of an expert report on infringement is whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether**. *See Digital Reg of Texas, LLC v. Adobe Sys., Inc*., 2014 WL 1653131, at *1 (N.D. Cal. Apr. 24, 2014).

*Mobile Telecomm. Techs., LLC v. Blackberry Corp*., No. 3:12-CV-1652-M, 2016 WL 2907735, at *1 (N.D. Tex. May 17, 2016) (emphasis added).

## III.    ANALYSIS

In its Motion, H&P identifies and moves to strike several infringement theories that it contends were raised for the first time in the report of Nabors's infringement expert, Dr. Rodgers. In response, Nabors does not seek leave to amend its contentions, but instead argues solely that the complained-of theories are not "new," and were instead adequately disclosed in Nabors's contentions. Accordingly, resolution of H&P's Motion to Strike turns on whether the relevant theory was previously set forth in Nabors's infringement contentions, *i.e.*, whether Dr. Rodgers is merely permissibly specifying the application and/or providing additional evidence in support of a disclosed theory, or is impermissibly substituting an entirely new theory altogether. *See Mobile Telecomm.*, 2016 WL 2907735, at *1. The Court will address each patent in turn.

### a.    The '663 patent

Claim 12 of the '663 patent recites a method that includes the following step: "receiving and displaying electronic data, wherein the electronic data includes quill position data, actual toolface orientation data, and recommended toolface orientation data." *See* '633 patent, cl. 12. H&P argues that Nabors's contentions regarding the '663 patent point to a single display to satisfy the "displaying" claim element, called the "MotiView UI." *See* ECF No. 211 ("D. App.") at App. 254–59; *see also* D. App. 77–82. The MotiView UI display is in the Bit Guidance

4

System ("BGS") accused product, and is viewable by drillers at the rig site. H&P contends that, in its final contentions, Nabors disclosed the display of certain gravity and magnetic toolface measurements, but not quill position data. *See* D. App. 258 ("The MotiView UI includes the compass display illustrated below in which green circles . . . are used to provide a visual indication of current and historical toolface measurements. . . . The toolface target is also shown as a darker green box with yellow text indicating the target orientation value.").

H&P argues that Dr. Rodgers discloses two new theories in his expert report. For the first, Dr. Rodgers opines that two distinct displays—MotiView UI and a display from the Flex-Oscillator product—from two separate products combine to meet the requirements of claim 12 of the '663 Patent. D. App. 583–86. For the second, Dr. Rodgers relies on a configurable display from AutoSlide at an H&P remote center—*i.e.*, a display that is not accessible by the drillers at the rig site. D. App. 586–91. H&P contends that not only do the two theories rely on previously undisclosed displays and products, but Dr. Rodgers discloses a theory for the display of quill position data for the first time.

In response, Nabors points to portions of its final contentions which it contends show how the AutoSlide accused product "receives" and "analyzes" the quill. ECF No. 231-1 at 19 (citing D. App. 254). Nabors further argues that it provided notice to H&P that it was accusing the Flex "suite" of products in conjunction with claim 12 of the '663 patent, but when it served its preliminary contentions, it did not know which specific applications performed which functions. *Id.* Nabors further contends that it only "recently" became aware of the configurable display from AutoSlide. *Id.*

The Court concludes that Dr. Rodgers's infringement report includes theories that do not fall within the scope of Nabors's preliminary and final contentions. Regarding quill position

data, the contentions recite the AutoSlide product only receiving and analyzing quill position data, not "receiving and displaying," as required by claim 12. The only display identified in Nabors's contentions is the MotiView UI compass display, which does not include quill position data. There is no disclosure of the configurable display from the AutoSlide product, or of two displays—the MotiView UI in conjunction with FlexOscillator—as satisfying this claim element. Moreover, in its preliminary contentions, Nabors identified the FlexApps only in the context of claim 12's preamble, and only when describing that AutoSlide leverages "several Flex Apps" in the context of making "decisions on when to slide and when to rotate," and not in the context of receiving and displaying electronic data, relevant to the claim term at issue here.

Moreover, Nabors's justifications regarding why it did not specifically identify the FlexOscillator or the configurable AutoSlide display in its contentions are irrelevant; such arguments could, in theory, support a showing of diligence when seeking to amend contentions, but Nabors has not moved to amend its contentions to include these allegedly newly discovered instrumentalities and accused products, and given the September 5, 2023, trial setting, it is too late to do so now. Where the Local Patent Rules require supplementing infringement contentions, as they do here, "solely submitting an . . . expert report containing such contentions cannot be sufficient." *See Corus Realty Holdings, Inc. v. Zillow Grp., Inc.*, 860 F. App'x 728, 734 (Fed. Cir. 2021).

In sum, the Court concludes that Dr. Rodgers's report impermissibly recites new theories of infringement for the '663 patent, contrary to the requirements of the Local Patent Rules, which justifies striking those portions of his report. *See, e.g.*, *Phigenix, Inc. v. Genentech, Inc.*, 783 F. App'x 1014, 1020 (Fed. Cir. 2019) ("[T]he exclusion of evidence is often an appropriate sanction for a party's failure to comply with the patent local rules."). However, the Court is

concerned that H&P's request for affected paragraphs to be stricken wholesale from Dr. Rodgers's report is overbroad, and potentially encompasses theories that were adequately disclosed in Nabors's contentions.[3]  By **May 10, 2023,** after consulting with Nabors's counsel, H&P shall provide the Court with more specificity as to the particular words or, if appropriate, whole paragraphs of Dr. Rodgers's report that should be stricken consistent with the Court's decisions in this Opinion as to whether Dr. Rodgers's theories, for all of the Nabors asserted patents, are new and not previously disclosed.  H&P shall provide the Court with the specific objections of Nabors's counsel, if any.

### b.  The '634 patent

Claim 1 of the '634 patent recites a method requiring, in part, "displaying the electronic data on a user-viewable display in a historical format depicting data resulting from a most recent measurement and a plurality of immediately prior measurements."  Pursuant to the parties' agreement, this Court construed "the electronic data" in claim 1 of the '634 patent to mean "data including quill position data, magnetic-based toolface orientation data and gravity-based toolface orientation data."  ECF No. 126 at 5.

In its preliminary contentions, Nabors presented a theory that identified "MWD azimuth data" as the only type of data being displayed to satisfy the "displaying" element in claim 1. D. App. 30–31.  In its final contentions, Nabors identified other displays, including the MotiView UI, as satisfying the "displaying" element.  D. App. 140–43 (describing "a visual indication of current and historical toolface measurements," display of "toolface data" and

---

[3] For example, H&P requests that ¶ 369 of Dr. Rodgers's report be stricken, which states "In my opinion, H&P directly and literally infringes claims 12, 14, 17, and 20 of the '663 Patent by performing the claimed method through its operation of H&P rigs that include the Bit Guidance System and FlexOscillator and/or AutoSlide."  D. App. 576. Given that Nabors's preliminary infringement contentions disclose "Defendants' Bit Guidance System[] [i]n combination with Defendants' AutoSlide[]" as satisfying claim 12's preamble (D. App. 75), the Court does not believe that striking ¶ 369 in its entirety is appropriate, as opposed to striking the phrase "and FlexOscillator."

"historical toolface data").  According to H&P, none of the displays disclosed in Nabors's contentions display quill position data.  In his expert report, Dr. Rodgers relies on a configurable AutoSlide display in H&P's remote center, which H&P moves to strike because it does not appear anywhere in Nabors's contentions and, for the first time, discloses the display of quill position data.

In response, Nabors argues that the display Dr. Rodgers is relying on in his report was previously disclosed.  For support, it points to a disclosure in its preliminary contentions in which a version of the display is shown, "albeit a version of the display in which the 'spindle' tracker"—*i.e.*, the portion of the display showing quill position data—"was toggled off."  ECF No. 23-1 at 23.  In addition, just as it did with the '663 patent, Nabors points to portions of its contentions discussing analyzing and receiving a parameter it characterizes as "quill position data" as constituting a disclosure of this theory.  *See* ECF No. 231-1 at 23 (citing D. App. 29, 32).

Again, as with the '663 patent, the Court concludes that disclosure of how particular data is *analyzed* or *received* does not suffice as a disclosure of how that same data is *displayed*. Moreover, by conceding that the "spindle tracker" view was "toggled off" in the display shown in its contentions, Nabors admits that its contentions do not identify the particular display that it now contends is "displaying" quill position data.  Nabors cannot point to one display in its contentions and rely on a different one in its infringement report.  Indeed, disclosure of a specific display is particularly important here, given that claim 1 is directed to "[a] method of visibly demonstrating a relationship between toolface orientation and quill position" and the element at issue recites, in part, "displaying the electronic data on a user-viewable display."  '634 patent, cl. 1.  The question of *which* display within the particular accused product satisfies these claim

elements is the crux of any infringement case as to this claim, which is why the Local Patent Rules require patentees to crystallize their infringement theories early on and specifically identify in their contentions "*where* each element of each asserted claim is found within each accused instrumentality." Local Patent Rule 3-1.

Put simply, Nabors's infringement contentions for the '634 patent are silent as to how the "displaying" quill position data limitation is satisfied by the accused products. Because Dr. Rodgers's report impermissibly recites a new theory of infringement for the '634 patent not otherwise disclosed in Nabors's infringement contentions, H&P's Motion to Strike is granted as to the '634 patent.

### c. The '154 patent

Claim 1 of the '154 patent recites, in part, an apparatus comprising a display device configured to display a visualization of an underground environment from the viewpoint of looking down the drill string, where the visualization comprises both a "first indicator" and a "positional difference"; H&P argues that Nabors discloses two new theories for the "first indicator" and "positional difference" limitations.

Claim 1 recites a visualization comprising "a first indicator extending from the three-dimensional depiction of the location of the drill bit . . . and indicating a direction toward the three-dimensional depiction of the drill plan." '154 patent, cl. 1. H&P argues that in its contentions, Nabors identified certain "green conical pointers" as satisfying the "first indicator" limitation, and notes Nabors included screenshots of the Bit Guidance System MotiViz display showing the relevant green pointers. D. App. 298 ("The green conical pointers indicate the direction of correction toward the desired drill plan path or trajectory as shown below. The pointers originate from the blue drill string and extend toward the lighter-shaded well plan."); *see*

*also* D. App. 103.  In his infringement report, Dr. Rodgers does not reference green conical pointers, and instead identifies "[a] line extending from the three-dimensional depiction of the location of the drill bit to a point on the three-dimensional depiction of the plan" as satisfying the "first indicator" limitation.  D. App. 649–50.  The screenshots provided by Dr. Rodgers in support of his opinion for this element depict a different view of the Bit Guidance System MotiViz display than the screenshots included in Nabors's contentions.  There are no green conical pointers visible in the images in Dr. Rodgers's report for this element.

Nabors argues that its contentions identify the same accused product, the Bit Guidance System MotiViz, as satisfying this claim element, and thus it has already disclosed this infringement theory; according to Nabors, the different screenshots and views provided by Dr. Rodgers constitutes additional evidence of the same theory.

The Court disagrees.  Claim 1 of the '154 patent describes a visualization of a downhole environment, with particular visual elements recited as depicting certain structures, such as the drill bit, or indicating certain information, such as direction.  Accordingly, disclosing a theory of infringement involves matching claim elements with the correlating visual elements within the visualization, *i.e.*, which part of the image is the first indicator?  By identifying a new visual element as satisfying a particular claim element—by asserting that a "line" instead of "green conical pointers" satisfies the first indicator element—Dr. Rodgers is disclosing a new theory of infringement.

Regarding the "positional difference" limitation, claim 1 of the '154 patent recites a visualization comprising "a positional difference between the three-dimensional depiction of the location of the drill bit and the three-dimensional depiction of the drill plan."  '154 patent, cl. 1. In its final infringement contentions, Nabors described its theory for this element by providing a

screenshot of the Bit Guidance System MotiViz display showing the green conical pointers, "with the white arrow added to the image to highlight the gap between the actual and target trajectories":



D. App. 296–97.

When discussing this "positional difference" element in his expert report, Dr. Rodgers provides both the screenshot above, which includes the green conical pointers (D. App. 648), but also a new screenshot showing a different view of the Bit Guidance System MotiViz interface:



D. App. 646.

11

H&P moves to strike only Dr. Rodgers's theory of infringement discussing this second view, on the grounds that Nabors's infringement contentions disclosed only a theory based on the view including the green conical pointers. The Court agrees. The view Nabors relied on in its contentions is different from this second view Dr. Rodgers provides in his report, constituting a new theory. Thus, the Court grants H&P's Motion to Strike as to '154 patent because Dr. Rodgers is relying on theories of infringement for the "first indicator" and "positional difference" elements that were not previously disclosed in Nabors's infringement contentions.

### d. The '655 patent

H&P seeks to strike four categories of Dr. Rodgers's opinions disclosed in his expert report relating to the '655 patent: (i) Dr. Rodgers's theories based on an "inherent' relationship between the toolface orientation and drilling operation parameters, including his "setpoints" and "wraps" theories; (ii) Dr. Rodgers's theories for "adjusting the quill," in the context of the '655 patent; (iii) Dr. Rodgers's theories as to claim 17 of the '655 patent; and (iv) Dr. Rodgers's theories as to the asserted dependent claims in the '655 patent. For the following reasons, the Court concludes that Nabors did not disclose these theories in its preliminary or final contentions, justifying exclusion of these portions of Dr. Rodgers's report.

Claim 1 of the '655 patent recites:

A method of using a quill to steer a hydraulic motor when elongating a wellbore in a direction having a horizontal component, wherein the quill and the hydraulic motor are coupled to opposing ends of a drill string, the method comprising:

monitoring an actual toolface orientation of a tool driven by the hydraulic motor by monitoring a plurality of drilling operation parameters each indicative of a difference between the actual toolface orientation and a desired toolface orientation; and

adjusting a position of the quill by an amount that is dependent upon each of the plurality of the monitored drilling operation parameters.

'655 patent, cl. 1 (emphasis added).

In claim 1, pursuant to the parties' agreement, the Court construed "a plurality of drilling operation parameters" to mean "two or more parameters of a drilling operation other than actual toolface orientation."  ECF No. 126 at 5.

### i. "Monitoring an actual toolface operation . . . by monitoring a plurality of drilling operation parameters"

H&P argues that claims 1 requires "indirect" monitoring of the actual toolface orientation, *i.e.*, that the actual toolface itself is not measured directly, but rather other parameters are monitored, which in turn are used to determine the actual toolface orientation. That is because the language of claim 1 requires "monitoring an actual toolface orientation of a tool driven by a hydraulic motor ***by monitoring*** a plurality of drilling operation parameters."

H&P contends that Nabors's contentions disregard this connection between the claim elements, and instead recite a theory in which the toolface is directly monitored through toolface sensors, and separately, drilling operation parameters are monitored, without discussion of how the drilling operation parameters are related to the toolface orientation, or how the actual toolface orientation is monitored *by* monitoring a plurality of drilling operation parameters. *See* D. App. 154–58 (final contentions); *see also* D. App. 42–48 (preliminary contentions). Despite Nabors treating the claim elements separately in its contentions, H&P argues that Dr. Rodgers now identifies two new theories on the grounds that there is an "inherent relationship" between drilling operation parameters—including rate of penetration ("ROP"), weight on bit ("WOB"), torque, differential pressure, and depth—and the toolface orientation, such that each of these parameters has a "predictable effect" on the actual toolface orientation.  D. App. 454–82.

First, in his "setpoints" theory, Dr. Rodgers opines that the ██████████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.  D. App. 458–67.  To that end,

Dr. Rodgers opines that ████████████████████████████████████████

██████████████████████████████████are "indicative of the difference between the

actual toolface orientation and a desired toolface orientation."  D. App. 467.  For Dr. Rodgers's

setpoints theory, H&P argues that Nabors discloses AutoDriller as an accused product for the

first time.  Second, in his "wraps" theory, Dr. Rodgers explains ███████████████████████

████████████████████████████████████████████████████████

████████████████████████  Dr. Rodgers explains that this theory depends, in part, on the use

of look-up tables in the source code ████████████████████████████████████

████████████████████.  D. App. 458, 469–73.  Nabors responds that Dr. Rodgers's

theories were disclosed previously, and that Dr. Rodgers cites the same source code in his report

that was included in its contentions.

Ȇ      In both its preliminary and final infringement contentions, Nabors splits the

"monitoring . . ." element in claim 1 into two components, as follows: [1-a] "monitoring an

actual toolface orientation of a tool driven by the hydraulic motor by," and [1-b] "monitoring a

plurality of drilling operation parameters each indicative of a difference between the actual

toolface orientation and a desired toolface orientation."  D. App. 42–48, 154–58.  For [1-a], the

preliminary contentions disclose a circular chart in the accused AutoSlide product, which "may

provide current and historical toolface orientation information."  D. App. 44.  For [1-b], the

preliminary contentions quote an AutoSlide data sheet explaining that "AutoSlide technology

analyzes many parameters to automate and optimize sliding including:" various parameters,

including top drive radial position and rotation rate, differential pressure, and weight on bit.

D. App. 45.  The preliminary contentions further point to a H&P patent publication describing an

automated slide drilling system analyzing a variety of data inputs and controlling the rig equipment to continuously adjust the orientation during a slide, and "the control data set corresponding to each measured depth may include any one or more of ROP, WOB, differential pressure, surface torque, spindle position, oscillation control, and the like." D. App. 47–48.

In its final contentions, for element [1-a], Nabors describes receiving toolface data "from the MWD system via the WITS input signals as illustrated below for gravity and magnetic toolface," and provides corresponding source code. D. App. 154. For element [1-b], the final contentions point to source code to explain that █████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████

D. App. 155–56. The "error" between the current toolface and the target is then determined and used in the "control solution" to make a correction. D. App. 156.

For both elements [1-a] and [1-b], Nabors cites to the following comment in H&P's source code, which Nabors characterizes in its contentions as "describ[ing] the steering of the [bottom hole assembly (BHA)] via the top drive to control [the] toolface" and "explain[ing] the use of various parameters to help keep the toolface on target":



D. App. 154–55, 157–58.

In its response and during the hearing, Nabors relied extensively on the inclusion of this source code comment in its contentions as providing disclosure of Dr. Rodgers's theories.

The Court has reviewed Nabors's preliminary and final contentions and Dr. Rodgers's report for these claim elements, and concludes that Dr. Rodgers's report impermissibly substitutes new infringement theories, not previously disclosed in Nabors's contentions.  As an initial matter, there is an abrupt reversal of Nabors's treatment in its contentions of the "monitoring . . ." element as consisting of two discrete components [1-a] and [1-b], to considering the claim elements collectively in Dr. Rodgers's report.  Indeed, Dr. Rodgers expressly acknowledges the interplay between the toolface orientation and the drilling parameters—*i.e.*, that the toolface orientation is monitored ***by*** monitoring the drilling parameters—which the contentions never do because the components are addressed separately.[4] *See* D. App. 454.  In addition, the contentions discuss drilling parameters in conjunction with optimizing and controlling a slide, and never discuss or describe an inherent relationship between drilling parameters and the toolface as now espoused by Dr. Rodgers, nor that these drilling parameters have a "predictable effect" on the actual toolface orientation.  Nor is there any explanation of how monitoring drilling parameters is used to *monitor* the toolface orientation, as required by the claim language, as opposed to describing how manipulating drilling parameters are used for controlling or optimizing the slide.

More importantly, the Court finds no disclosure in Nabors's contentions of Dr. Rodgers's theories based on details of this supposed inherent relationship, namely his setpoints and wraps theories.  For both of these theories, Nabors relies heavily on the same source code comment, provided above, arguing in part that because Dr. Rodgers cites the same comment in his report that was cited in the contentions, the theories were disclosed in Nabors's contentions.

---

[4] Although Nabors's contentions nominally identify component [1-a] as "monitoring an actual toolface orientation of a tool driven by the hydraulic motor *by*," neither the preliminary nor final contentions actually disclose a connection or relationship between components [1-a] and [1-b].

However, the Court finds that neither the setpoints or wraps theory is disclosed by this particular comment, nor by the remainder of Nabors's contentions.  At best, the comment describes using setpoints for ███████████████████████████████████████████ ███████████; again, it says nothing about using drilling parameters to *monitor* the toolface orientation, or that monitoring the parameters relative to their respective setpoints is indicative of the difference between the actual toolface orientation and a desired toolface orientation.  Nor is there any reference to "wraps" or the use of any lookup table in the contentions, let alone Nabors's new theory that toolface orientations at certain depths can be maintained by using certain parameters and look-up tables to calculate the requisite number of "wraps."  And although Dr. Rodgers relies on the AutoDriller product throughout his report, AutoDriller is never referenced in Nabors's contentions.

Nabors would seemingly require H&P to intuit its very specific and particular theories of infringement based on vague and oblique references in its contentions to using drilling parameters for "maintaining" and "controlling" the toolface.  *E.g.*, ECF No. 231-1 at 10 ("[The wraps theory] is not a new theory. Nabors' supplemental infringement contentions asserted that AutoSlide analyzes ROP, differential pressure, and WOB 'to maintain the toolface.' . . .").  But for infringement contentions to have any utility in streamlining issues in litigation, parties are required to "crystallize" their theories of the case early on, which necessarily requires specificity. *See O2 Micro*, 467 F.3d at 1364.  Here, Nabors's contentions fail to even generally disclose Dr. Rodgers's theories, justifying their exclusion.

### ii.  Adjusting the quill

Claim 1 of the '655 patent describes "adjusting a position of the quill by an amount that is dependent upon each of the plurality of monitored drilling operation parameters."  '655 patent,

cl. 1.  According to H&P, Nabors's final contentions only describe the traditional way of steering—simply adjusting the top drive to redirect the toolface—without explanation for the claim requirement for adjusting the quill "by an amount that is dependent upon each of the plurality of the monitored drilling operation parameters."  *See* D. App. 158–62.  In contrast, Dr. Rodgers provides four theories in support of the "adjusting the quill" element, which H&P contends were not disclosed and, therefore, should be struck.

The first two theories invoke the setpoints and wraps theories discussed previously.  *See* D. App. 483 ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ██████████████████████████████████████████.  As discussed, Nabors did not disclose these theories in its contentions for the "monitoring . . ." element; its contentions as to the "adjusting the quill" element similarly fail to provide H&P with notice of these particular theories of infringement.

The Court likewise concludes that Nabors did not disclose in its contentions Dr. Rodgers's third and fourth theories of infringement for the "adjusting the quill" element.  *See* D. App. 483–84 ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████

For Dr. Rodgers's third theory, Nabors argues that its final contentions cite the very same source code function that Dr. Rodgers cites for this theory in his report.  *See* D. App. 159, 496. However, citing source code is not the same as disclosing a theory, and here, the Court concludes

that the theories are different.  In its contentions, Nabors characterizes this particular source code as showing that ███████████████████████████████████████████ ███████████████████████████████████; put differently, the contentions describe making a reactive, corrective adjustment.  *See* D. App. 159.  In contrast, Dr. Rodgers in this third theory describes *preemptive* adjustments to the spindle to maintain control based on *anticipated* reactive torque.  *See* D. App. 493–501.

     In his fourth theory for this element, Dr. Rodgers describes that AutoSlide uses



D. App. 501–04.  The Court has reviewed Nabors's contentions and concludes that neither the specific ███████████████████████████ ████████████████████████████████████████████ are disclosed; as a result, this theory is new.[5]

### iii.  Claim 17

     H&P moves to strike Dr. Rodgers's theories as to claim 17 of the '655 patent.  Claim 17, like claim 1, recites a method of using a quill to steer a hydraulic motor, which includes a step of "monitoring an actual toolface orientation of a tool driven by the hydraulic motor by monitoring a drilling operation parameter indicative of a difference between the actual toolface orientation and a desired toolface orientation," and then "adjusting a position of the quill by an amount that is dependent upon the monitored drilling operation parameter."  '655 patent, cl. 17.  Pursuant to

---

[5] Nabors argues that its preliminary contentions cite evidence indicating that H&P aligns the BHA with a calculated off-bottom toolface orientation by making "an angular position adjustment . . . using the spindle at the top drive." ECF No. 231-1 at 14 (citing D. App. 47).  However, this portion of the preliminary contentions is directed towards a different claim element—namely, element [1-b] of the '655 patent, "monitoring a plurality of drilling operation parameters . . ." discussed previously—and accordingly, do not qualify as a disclosure for the "adjusting the quill" element of claim 1 the '655 patent.

the parties' agreement, the Court construed "a drilling operation parameter" in claim 17 to mean "a parameter of a drilling operation other than actual toolface orientation."  ECF No. 126 at 5.

In both its preliminary and final infringement contentions for the "monitoring" and "adjusting" elements of claim 17 of the '655 patent, Nabors incorporates by reference its analysis for the related limitation in claim 1.  *See, e.g.*, D. App. 56–57, 181–82.  Similarly, Dr. Rodgers incorporates by reference his analysis of claim 1 for these elements, on the grounds that the claim elements are "nearly identical," and the only difference is that claim 17 describes monitoring and adjusting based on "a drilling operation parameter" as opposed to "a plurality of drilling operation parameters."  D. App. 513–14.  Thus, the portions of Dr. Rodgers's report for the "monitoring" and "adjusting" elements of claim 17 contain new theories for the same reasons as do his opinions regarding the equivalent elements in claim 1.

Claim 17 further recites that adjusting the quill position "comprises adjusting a neutral rotational position of the quill, and wherein the method further comprises oscillating the quill by rotating the quill through a predetermined angle past the neutral position in clockwise and counterclockwise directions."  Nabors's preliminary contentions reference an AutoSlide data sheet, and explain that "AutoSlide leverages several Flex Apps" and FlexOscillator 2.0 rig control software "automates drill string rotation by oscillating the quill by rotating the quill a predetermined angle past the neutral position in clockwise and counterclockwise directions."  D. App. 57.  The final contentions further explain that "a desired oscillation" can be input manually into FlexOscillator, and "[t]he control includes a neutral position and setpoints for forward and reverse torque for the oscillation."  D. App. 183–85.

H&P contends that Dr. Rodgers introduces a new theory for this element, in which "AutoSlide can adjust a neutral rotational position of the quill," "AutoSlide instructs

FlexOscillator to oscillate the quill back and forth while sliding," and "AutoSlide sets a neutral point of rotation or offset." D. App. 515–22. H&P thus argues that Nabors has reversed its theory, because instead of FlexOscillator automating drill string rotation by oscillating the quill and receiving manual inputs for the desired oscillation, as was disclosed in Nabors's contentions, Dr. Rodgers is now arguing that AutoSlide controls the oscillation, and Flex Oscillator merely implements the oscillation. In response, Nabors argues that its contentions are sufficient "to put H&P on notice that Nabors intended to rely on AutoSlide's interactions with FlexOscillator to satisfy this claim limitation." ECF No. 231-1 at 16. However, such notice does not suffice under the Local Patent Rules; Nabors was required to disclose "the identity of each structure, act, or material in the accused instrumentality that performs the claimed function." Local Patent Rule 3-1(a). Because Nabors is no longer taking the position that FlexOscillator automates the drill string rotation by oscillating the quill by rotating the quill a predetermined angle past the neutral position in clockwise and counterclockwise directions, Dr. Rodgers's theory is new.

In addition, Dr. Rodgers discloses additional theories relying on his setpoint and wraps theories from his discussion of claim 1 of the '655 patent, which he incorporates by reference into his discussion of this limitation claim 17. D. App. 522–29. As discussed, those theories were not disclosed in Nabors's contentions, and are therefore new.

### iv. Dependent claims

H&P moves to strike alleged new theories in Dr. Rodgers's report as to the asserted dependent claims in the '655 patent, namely claims 5, 6, and 13, on the grounds that his infringement theories generally refer back and mirror his theories for claim 1. The Court has reviewed Dr. Rodgers's report for these claims, and concludes that ¶¶ 207–15, 225, 227, and

229–32 of Dr. Rodgers's report incorporate by reference and/or rely on theories that the Court has already found to be new and not previously disclosed.

H&P also argues that Dr. Rodgers's theory of infringement for limitation 6[b] was not previously disclosed.  Claim 6 recites "[a] [t]he method of claim 1 wherein monitoring the drilling operation parameter comprises monitoring data received from a toolface orientation sensor, and [b] wherein the amount of quill position adjustment is dependent upon the toolface orientation sensor data."  '655 patent, cl. 6.  For element 6[b], Nabors's final contentions point to the "slide controller general operation," which is described as controlling the rotation of the spindle or quill and position of the drill string, and is used in conjunction with ██████████ ████████████████████████████████████████████████████  D. App. 168–70.  In contrast, Dr. Rodgers relies ██████████████████████████████████████████████████████████ █████████████████████████████████████████████; Dr. Rodgers does not reference ████████████████  in his report.  D. App. 510–13.  The Court agrees this constitutes a new theory; by pointing to a different calculation  and functionality in the source code, Nabors is revising the theory in the contentions of "where each element of each asserted claim is found within each accused instrumentality."  Local Patent Rule 3-1(a).  The Court finds that ¶¶ 222–24 and 228 of Dr. Rodgers's report contain new theories.

### e.  The '171 patent

Finally, H&P moves to strike certain of Dr. Rodgers's infringement theories as to the '171 patent.  The '171 patent is a continuation of the '655 patent, and discloses a method for controlling directional drilling using a quill to steer a hydraulic motor when elongating a wellbore in a direction having a horizontal component, wherein the quill and the hydraulic motor

are coupled to opposing ends of a drill string.  '171 patent, at Abstract.  H&P seeks to strike

theories relating to claims 13 and 26 of the '171 patent.

Claim 13 recites:

A method of elongating a wellbore in a direction having a horizontal component comprising:

[a] detecting a current toolface orientation with respect to vertical;

[b] comparing the current toolface orientation to a desired toolface orientation based on operating parameters;

[c] employing at least one controller to analyze whether one or more comparable operating parameter has been previously recorded;

[d] generating drilling control signals to oscillate a quill based on any of the previously recorded drilling operation parameter to redirect the toolface to a corrected drilling path; and

[e] rotating a tubular along the corrected drilling path.

'171 patent, cl. 13.

The Court construed "comparable operating parameter" in claim 13 of the '171 patent to

have its plain and ordinary meaning, Plain and ordinary meaning, *i.e.* operating parameters such

as WOB, torque, RPM, pressure, ∆P, data received from a toolface orientation sensor, depth, and

ROP, that was compared to the current toolface orientation in the previous step of the claimed

method.  ECF No. 126 at 21.

H&P argues that in its contentions for claim 13, Nabors described generally measuring

drilling parameters, unrelated to actual toolface orientation, and taking direct measurements of

the toolface.  H&P contends that, similar to his theories for the '655 patent, Dr. Rodgers now

relies on ███████████████████████████████████████████████████████████

█████████████████, which was not disclosed in the contentions.

The Court agrees. Specifically, for element 13[b], Nabors's preliminary contentions provide a list of drilling parameters analyzed by AutoSlide technology "to automate and optimize sliding," and point to a circular chart providing "current and historical toolface orientation information." D. App. 62–65. Nabors's final contentions consist of one paragraph, stating ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ pointing to source code. D. App. 207–08. However, Dr. Rodgers's report for this element incorporates by reference his analysis of claim element 1[a] of the '655 patent, and opines that ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████ D. App. 531–32. Portions of Dr. Rodgers's analysis for elements 13[c] and [d] likewise rely on the previously undisclosed wraps theory, as does his analysis for claim 26. D. App. 537–45, 547; *see, e.g.*, D. App. 547 ("FlexOscillator then rotates the quill clockwise from a neutral point and then again counterclockwise by a predetermined number of wraps, as discussed above in my analyses of claim element 13[d] and claim element 17[c] of the '655 Patent, which I incorporate here."). Accordingly, these portions of Dr. Rodgers's report—specifically, ¶¶ 273–74, 283–85, 292–301, and 308–09—contain new theories.

H&P points to an additional, allegedly new theory Dr. Rodgers provides for element 13[c]. In its contentions, Nabors pointed to source code describing ██████████████ ████████████████████████████████████████████████████ ████████████████████████████ D. App. 208–09. In his infringement report, Dr. Rodgers instead points to a ██████████████████████████████████████████

24

█████████████████████████████████████████ D. App.

537–40.  Dr. Rodgers thus opines that "for AutoSlide to analyze historical data ██████████

████████████████████████, it must first check to see whether one or more comparable

operating parameters has been previously recorded," thus satisfying the limitation in 13[c].

Because Nabors never previously cited this functionality or theory in connection with this claim

element, this theory is new.

## IV.    CONCLUSION

For the foregoing reasons, H&P's Motion to Strike is **GRANTED** in its entirety.

Because the Court is concerned about potential overbreadth in H&P's requested exclusions, by

**May 10, 2023,** H&P shall provide the Court with more specificity as to the particular words or, if

appropriate, whole paragraphs of Dr. Rodgers's report that should be stricken consistent with the

Court's decisions in this Order.

**SO ORDERED**.

May 3, 2023.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE